### THE PEOPLE, *ex rel.* GRIFFIN, *vs.* THE MAYOR, &c. OF BROOKLYN.

A statute which authorizes a municipal corporation to grade and improve streets *and to assess the expense among the owners and occupants of lands benefited by the improvement, in proportion to the amount of such benefit,* is a constitutional and valid law. The case of *The People* v. *The Mayor, &c. of Brooklyn,* (6 *Barb.* 209,) overruled.

Such an assessment is an exercise of the power of taxation vested in the state government, and is not in conflict with that part of the constitution which declares that "no person shall be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation."

Private property may be taken for public use either by taxation or by the right of eminent domain.

Taxation exacts money from individuals as their share of a public burthen, and the tax-payer receives or is supposed to receive just compensation in the benefits conferred by government, and in the proper application of the tax.

But where property is taken by right of eminent domain, it is taken not as the owner's share of a public burthen, but as so much more than his share.. Special compensation is therefore to be made.

Taxation operates upon a community or upon a class of persons in a community, [420] and according to some rule of apportionment.

**(419)**

The People *v.* Mayor, &c. of Brooklyn.

The exercise of the right of eminent domain operates upon individuals, and without regard to the amount or value exacted from any other individual or class of individuals.

The power to tax, implies a power to *apportion* the tax as the legislature shall see fit; and the power of apportionment has no limit where there is no *constitutional* restraint.

And there is nothing in the constitution of this state which requires that taxation shall be general so as to embrace all taxable persons within the state, or within any district or territorial division of the state, or that it shall be equal, as in the case of a capitation tax, or that it shall be in proportion to the value of the property of the persons taxed, or that it shall not be apportioned *according to the benefit which each tax-payer is supposed to receive from the object on which the tax is expended.*

The remedy against unwise or unjust modes of taxation is to be sought from the legislative department of the government, and not from the judiciary.

UNDER the charter of the city of Brooklyn, the common council in the year 1848 caused Flushing avenue, one of the streets of that city, to be graded and paved at an expense of $20,390,25, which, according to a provision in the charter, was assessed upon the owners or occupants. of the lands benefited by the improvement, in proportion to the amount of such benefit. After the assessment had been confirmed by the common council, Griffin and others, the relators, caused the proceedings to be removed by certiorari into the supreme court, where the proceedings were reversed and the assessment annulled, on the ground that the statute authorizing such assessments was unconstitutional and void. The mayor and common council appealed to this court. The case is stated in the opinion of the court.

*S. Beardsley* and *J. C. Spencer,* for appellants. (*a*)

*A. Crist* and *R. Mott,* for respondents. (*b*)

RUGGLES, J. By the 40th section of the act to incorporate the city of Brooklyn, passed April 8th, 1834, power is given to the common council of that city " to cause all streets, avenues, and squares within the first seven wards, and the fire and watch

(*a*) (*b*) The points and authorities cited on the argument, will be found in the appendix.

The People v. Mayor, &c. of Brooklyn.

districts of said city, to be graded, levelled, gravelled, [421] paved, or McAdamized, and to cause cross walks to be made, and drains and sewers to be constructed."

" The expense of such measures shall be assessed by the assessors of said city, elected in and for the first seven wards thereof, upon the owners and occupants of all the lands and premises benefited thereby, in proportion to the amount of such benefit. Warrants for that purpose shall be issued, from time to time, by the common council, under their corporate seal, to the said assessors. Such assessment shall be signed by the said assessors and delivered by them to the clerk of the common council, who shall give public notice, in the newspaper or newspapers employed by the corporation, that the same has been so left with him, and that the common council will on a certain day therein stated, which shall not be less than ten days from the first publication of such notice, proceed to confirm the said assessment. During that period, any person interested may appeal from the same to the said common council, who may determine such appeal, and alter such assessment in such manner as in their opinion justice may require. The same may be then confirmed by them without further notice. All such assessments shall constitute a lien upon the lands and premises respectively upon which they shall be made. They may be paid to the treasurer within the same time, or in default thereof, they shall be collected in the same manner, as in the act prescribed in relation to assessments for the laying out and opening of streets in the said city."

The 42d section authorizes the collection of any assessments or tax imposed for local or city purposes, out of the personal property of the owner of the land assessed ; and if sufficient personal property can not be found, the land may be sold at public auction for the lowest term of years for which any person will take the same and pay the assessment with interest and expenses.

Flushing avenue was declared to be a public street by an act of the legislature in 1846. It does not appear that the land belonged to the relators. After the passing of that act two of the

[422] owners of land adjacent to the avenue applied by petition to the common council to have the avenue graded and paved; and the common council caused this to be done at an expense of $20,390,25. That amount was afterward assessed upon and among the owners and occupants of all the lands and premises benefited thereby in proportion to the amount of such benefits.

The grading and paving of the avenue was done under a contract made with the common council; and the city having paid, or being liable for the amount, the assessment was made to reimburse the treasury, or to supply it with the means of payment.

The supreme court reversed and annulled the assessment, holding,

First. That the assessment was not a lawful exercise of the power of taxation.

Secondly. That money is property; that it can not be taken from a citizen for public use by the right of eminent domain, without just compensation; and that the enhancement in value of the relators' lands, by the grading and paving of Flushing avenue, is not that just compensation within the meaning of the constitution.

Thirdly. That the money not being taken by the just exercise of either these powers, is taken, or exacted without due process of law, and therefore in violation of the 6th section of the first article of the constitution, and the assessment is void. The case has been heard and is now to be decided on appeal.

Private property may be constitutionally taken for public use in two modes: that is to say, by *taxation* and by right of *eminent domain*. These are rights which the people collectively retain over the property of individuals, to resume such portions of it as may be necessary for public use.

The right of taxation and the right of eminent domain rest substantially on the same foundation. Compensation is made when private property is taken in either way. Money is property. Taxation takes it for public use; and the tax-payer receives, or is supposed to receive his just compensation in the protection which government affords to his life, liberty and [423] property, and in the increase of the value of his posses-

sions by the use to which the government applies the money raised by the tax. When private property is taken by right of eminent domain, special compensation is made, for the reason hereafter stated.

For the purpose of determining the constitutional question raised on the argument of this case, the first inquiry will be whether the street assessment in question was a rightful exercise of the power of taxation. If that question be answered in the affirmative, the objections made in the court below to the validity of the assessment are inapplicable. They were founded on those clauses in the constitution which declare that no person shall be deprived of his property without due process of law, and that private property shall not be taken for public use without just compensation. Neither of these prohibitions apply to taxation.

No land was taken from the relators, or other persons assessed for the making of Flushing avenue. The question, therefore, whether compensation for land taken for such use, could be made in estimated benefits, does not arise.

If the assessment was a rightful exercise of the power of taxation, nothing has been exacted under the right of eminent domain, and no compensation need be made, except that which is supposed in all taxation to be derived by the tax-payer from the application of the money raised to the purpose for which the tax is laid.

Mr. Justice Barculo, in *The People* v. *The Mayor, &c. of Brooklyn,* (6 *Barb.* 214,) in speaking of taxation and of taking private property for public use, observes, " that it is by no means easy to trace the dividing line between the two kinds of taking private property, and that the two appear in principle to be somewhat blended. Both are exercises of the sovereign power over individual property, and in both cases the individual is presumed to receive, or does in fact receive some equivalent for the contribution." I agree to the truth of these propositions, excepting that I perceive no great difficulty in pointing out the distinction between these two powers.

Taxation exacts money, or services, from individuals, as [424]

and for their respective shares of contribution to any public burthen.

Private property taken for public use by right of eminent domain, is taken not as the owner's share of contribution to a public burthen, but as so much beyond his share.

Special compensation is therefore to be made in the latter case, because the government is a debtor for the property so taken; but not in the former, because the payment of taxes is a duty and creates no obligation to repay, otherwise than in the proper application of the tax.

Taxation operates upon a community or upon a class of persons in a community and by some rule of apportionment.

The exercise of the right of eminent domain operates upon an individual, and without reference to the amount, or value exacted from any other individual, or class of individuals.

Keeping these distinctions in mind, it will never be difficult to determine which of the two powers is exerted in any given case.

It may be proper here, although not strictly necessary, to express the opinion that money can not be exacted by the government by right of eminent domain, excepting, perhaps, for the direct use of the state at large, and when the state at large is to make the compensation.

The exigencies of a state government can seldom require the taking of money by virtue of this power even in time of war, and never in time of peace. The framers of the constitution could not have intended to delegate to municipal corporations the right of taking money under this power, because it is entirely unnecessary. Money can always be had by taxation; lands can not; and therefore lands may be taken by right of eminent domain, but money may not. The 7th section of article 1 of the constitution, confirms this construction of the power. It directs the compensation for private property so taken, to be ascertained by a jury, or by commissioners. This is an appropriate mode when lands or goods are taken, because their value is uncertain; but not when money is taken, because its value is already fixed.

The validity of the assessment in question, therefore, [425] can not be maintained as an exercise of the power of eminent domain; and it can not be maintained at all unless it be a legitimate mode of taxation.

It is conceded that the grading and paving of Flushing avenue was a public work, the expense of which might rightfully have been raised by general taxation upon all the taxable inhabitants of Brooklyn. The legislature thought proper to shift the burthen of this taxation upon that part, or class of the taxable inhabitants exclusively, whose lands were benefited by the work, and to impose it on them in proportion to the benefit they respectively received therefrom.

This change in the apportionment of the burthen was obviously made for the purpose of avoiding the injustice of general taxation for a special local object, the benefit of which extended only to a portion of the inhabitants of the city. It professed to apportion the tax according to the maxim, that "he who receives the advantage ought to sustain the burthen," and to exact from each of the parties assessed no more than his just share of the burthen according to this equitable rule of apportionment. The assessment, therefore, was taxation, and not an attempt to exercise the right of eminent domain.

· If there be any sound objection to the assessment as a tax, it must be an objection which applies to the principle on which the tax is apportioned; because the object for which the money was to be raised is, without dispute, one for which taxation by a different rule of apportionment would have been lawful.

It remains to be seen whether any thing can be found in the constitution; in legal adjudication; in the practice of the government, or in the nature of things, by which taxation upon this principle of apportionment can be judicially annulled.

For the purpose of ascertaining what has been deemed, on high authority, the nature and extent of the power of taxation vested in the legislatures of the state governments, I refer to the opinion of the late Chief Justice Marshall, in the case of the *Providence Bank* v. *Billings*, (4 *Peters*, 514, 561, 563.)

"The power of legislation, and consequently of taxation,

[426] operates on all the persons and property belonging to the body politic. This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government as part of itself, and need not be reserved where property of any description or the right to use it in any manner is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burthens; *and that portion must be determined by the legislature.* This vital power may be abused, but the interest, wisdom and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation." And again, in *McCullock* v. *Maryland*, (4 *Wheat.* 428,) the following observations are found coming from the same high authority. " It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax the government acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation. The people of a state therefore give to their government a right of taxing themselves and their property; and as the exigencies of the government can not be limited they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislature and the influence of the constituents over their representatives to guard them against its abuse."

And again, at page 430, he speaks of it as " unfit for the judicial department to inquire what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power."

Assuming this, as we safely may, to be sound doctrine, it must be conceded that the power of taxation and of apportioning taxation, or of assigning to each individual his share of the

burthen, is vested exclusively in the legislature, unless this power is limited or restrained by some constitutional pro- [427] vision. The power of taxing and the power of apportioning taxation are identical and inseparable. Taxes can not be laid without apportionment : and the power of apportionment is therefore unlimited, unless it be restrained as a part of the power of taxation.

There is not, and since the original organization of the state government there has not been any such constitutional limitation or restraint. The people have never ordained that taxation must be limited or regulated by any or either of the rules laid down by the supreme court in the case of *The People* v. *The Mayor of Brooklyn*, (6 *Barb*. 209,) or in the case now under consideration. They have not ordained that taxation shall be general, so as to embrace all persons or all taxable persons within the state, or within any district, or territorial division of the state ; nor that it shall or shall not be numerically equal, as in the case of a capitation tax ; nor that it must be in the ratio of the value of each man's land, or of his goods, or of both combined; nor that a tax "must be co-extensive with the district, or upon all the property in a district which has the character of and is known to the law as a local sovereignty." Nor have they ordained or forbidden that a tax shall be apportioned according to the benefit which each tax-payer is supposed to receive from the object on which the tax is expended. In all these particulars the power of taxation is unrestrained.

The application of any one of these rules or principles of apportionment, to all cases, would be manifestly oppressive and unjust. Either may be rightfully and wisely applied to the particular exigency to which it is best adapted.

Taxation is sometimes regulated by one of these principles, and sometimes by another; and very often it has been apportioned without reference to locality or to the tax-payer's ability to contribute, or to any proportion between the burthen and the benefit. The excise laws, and taxes on carriages and watches, are among the many examples of this description of taxation. Some taxes affect classes of inhabitants only. All duties on

imported goods are taxes on the class of consumers. The tax on one imported article falls on a large class of consumers, [428] while the tax on another affects comparatively a few individuals. The duty on one article consumed by one class of inhabitants is twenty per cent of its value; while on another, consumed by a different class, it is forty per cent. The duty on one foreign commodity is laid for the purpose of revenue mainly, without reference to the ability of its consumers to pay; as in the case of the duty on salt. The duty on another is laid for the purpose of encouraging domestic manufactures of the same article; thus compelling the consumer to pay a higher price to one man, than he could otherwise have bought the article for, from another. These discriminations may be impolitic, and in some cases unjust; but if the power of taxation upon importations had not been transferred by the people of this state to the federal government, there could have been no pretence for declaring them to be unconstitutional in state legislation.

A property tax for the general purposes of the government, either of the state at large or of a county, city or other district, is regarded as a just and equitable tax. The reason is obvious. It apportions the burthen according to the benefit more nearly than any other inflexible rule of general taxation. A rich man derives more benefit from taxation, in the protection and improvement of his property, than a poor man, and ought therefore to pay more. But the amount of each man's benefit in general taxation cannot be ascertained and estimated with any degree of certainty; and for that reason a property tax is adopted instead of an estimate of benefits. In local taxation, however, for special purposes, the local benefits may in many cases be seen, traced and estimated to a reasonable certainty. At least this has been supposed and assumed to be true by the legislature, whose duty it is to prescribe the rules on which taxation is to be apportioned; and whose determination of this matter, being within the scope of its lawful power, is conclusive.

In the case of *The People* v. *Brooklyn*, before referred to, it was said that a tax to be valid must be apportioned " upon

principles of just equality," and upon all the property in the same political district; and that this is a fundamental principle of free government, which, although not contained in the constitution, limits and controls the power of the legislature. [429] This is new and it seems to me to be dangerous doctrine. It clothes the judicial tribunals with the power of trying the validity of a tax by a test neither prescribed nor defined by the constitution. If by this test we may condemn an assessment apportioned according to the relation between burthen and benefit, we may with far better reason condemn a capitation tax on the ground that numerical equality is not just equality; or a general property tax, for a local object, because it compels one portion of the community to pay more than their just share for the benefit of another portion. All discriminations in the taxation of property, and all exemptions from taxation on grounds of public policy, would fall by the application of this test. If this doctrine prevails it places the power of the courts above that of the legislature in a matter affecting not only the vital interests, but the very existence of the government. It assumes that the apportionment of taxation is to be regulated by judicial, and not by legislative discretion. It obstructs the exercise of powers which belong to, and are inherent in the legislative department, and restrains the action of that branch of the government in cases in which the constitution has left it free to act.

The idea that a tax or assessment of this kind must be made to embrace all the property within the city or ward in which the improvement is made, seems to have originated in Kentucky from the opinion of an eminent judge of the court of appeals of that state, in the case of *Sutton's Heirs* v. *The City of Louisville,* (5 *Dana,* 28.) But that opinion was founded mainly on a clause in the constitution of that state, which is not to be found in ours; and in respect to this point, the opinion was afterwards modified by the same judge, and the principle in effect abandoned in the case of *The City of Lexington* v. *McQuillan's Heirs,* (9 *Dana,* 513.) The charter of the last mentioned city contained a provision which authorized the mayor and common council to

cause the streets therein to be paved or turnpiked at the expense of the lot owners fronting such streets, and when the work was completed, to apportion the expense equally among [430] the lot owners. McQuillan's heirs were charged with a sum which greatly exceeded the proportionate cost of the entire work done opposite the lots of ground respectively in the same square, in consequence of a deep cut and stone wall made opposite to their lot. They refused to pay, and resisted the collection of the money on the ground that the act and the tax were unconstitutional.

It was held by the court of appeals of that state, that the apportionment of the expenses was irregular and erroneous, because the ratio of contribution was required by the charter to be equal among the lot owners. But the act was held to be valid and constitutional on the ground that each square, so far as its streets and side-walks were concerned, might be considered a distinct municipality, or local public; and the court of appeals sent the case back for a re-assessment according to the ratio prescribed in the charter, and authorized the collection of the money when its amount should be so ascertained. Whatever, therefore, may be thought of the reasons given for the decision, the judgment, if an authority at all, supports the assessment now in question against the objection that it was not co-extensive with the city or ward in which Flushing avenue is situated. The local public, in that case as in this, was ascertained and defined by the authorities to which the power of taxation was delegated.

But there never was any just foundation for saying that local taxation must necessarily be limited by or co-extensive with any previously established district. It is wrong that a few should be taxed for the benefit of the whole; and it is equally wrong that the whole should be taxed for the benefit of a few. No one town ought to be taxed exclusively for the payment of county expenses; and no county should be taxed for the expenses incurred for the benefit of a single town. The same principle of justice requires that where taxation for any local object benefits only a portion of a city or town, that portion

only should bear the burthen. There being no constitutional prohibition, the legislature may create a district for that special purpose, or they may tax a class of lands or persons benefited, to be designated by the public agents appointed for that purpose, without reference to town, county, or dis- [431] trict lines. General taxation for such local objects is manifestly unjust. It burthens those who are not benefited, and benefits those who are not burthened. This injustice has led to the substitution of street assessments in place of general taxation; and it seems impossible to deny that in the theory of their apportionment they are far more equitable than general taxation for the purpose they are designed for.

The same principle of apportionment has been applied to bridges and turnpike roads. The money paid for their construction and maintenance is reimbursed by means of tolls. Tolls are delegated taxation; and this taxation is charged and apportioned upon those only who derive a benefit from the original expenditure, and in proportion to that benefit. General taxation upon a town or county for the building of a bridge is valid and lawful, but obviously unjust; because it compels one to pay for the benefit of another. Tolls are more equitable, because they equalize the burthen with the benefit.

But this theory of apportioning taxation is not confined in practice to street assessments and tolls on bridges and turnpike roads. The main revenues of the state, the canal tolls, are regulated upon the same principle; and so far as the objection to street assessments applies to the principle of selecting those only who are benefited, and laying the burthen on them in proportion to their respective advantages, it applies with equal force to tolls on bridges and turnpikes, and on the public canals. The difference is only in the mode in which each tax-payer's share of the burthen is ascertained.

It has been said that the benefits derived from the grading and paving of a street are sometimes fanciful and imaginary, and always uncertain and incapable of being estimated with that exactness which is necessary for the purposes of justice to the individuals assessed. But this is a consideration to be ad-

dressed to the legislature, and not to the judicial authorities. The courts cannot assume that this proposition is true in point of fact. The legislature has evidently acted on the belief that it is untrue. That mistakes may have happened, that abuses [432] may have been practised, and that injustice may have been done, in making street assessments, it is not necessary to deny. Mistakes, abuses and injustice have often occurred in general taxation. These are not grounds on which either system of supplying the public treasury can be denounced as unconstitutional. If the systems are imperfect, they should be reformed by the legislature. If street assessments are in their practical operation oppressive and unjust, the statutes which authorize them should be repealed. The remedy for unjust or unwise legislation, is not to be administered by the courts. It remains in the hands of the people; and is to be wrought out by means of a change in the representative body, if it can not be otherwise obtained. The constitution has imposed upon the legislature the duty of restraining the power of municipal corporations in making assessments, and of preventing abuses therein. (*Art.* 8, § 9.) To assume that this duty has been and will be neglected, is a denial of that reasonable confidence which one department of the government ought always to entertain towards the others. The danger of abuse which is supposed to exist in the making of street assessments, exists in a greater or less degree, in every conceivable system of taxation, according to value; and if the courts have authority to annul an assessment on this ground, they have the like authority to annul any other tax assessed upon valuation, on the same ground. It need not be said that this would be a much more alarming power than the unlimited right of taxation intrusted by the people to their representatives.

The constitutionality of the assessment in question, as a tax, has thus far been considered upon reason and principle, and without reference to judicial decisions on this subject. An examination of these authorities will show that they are in conformity with conclusions derived from reason and principle.

The difference between general taxation and special assess-

ments for local objects, requires that they should be distinguished by different names, although both derive their authority from the taxing power. They have always been so distinguished, and it is therefore evident that the word "tax" may be used in a contract, or in a statute, in a sense which would [433] not include a street assessment, or any other local or special taxation within its meaning. Several cases are found in which it has been adjudged to have been so used. But in no case has it been adjudged that street assessments are not made by virtue of the legislative taxing power. If there are expressions to the contrary, in some of the cases, it will be found that they are *dicta* inapplicable to the point decided, or if applicable, that they were unnecessary to the decision and not well considered.

*In the matter of the Mayor, &c. of New-York, for improving Nassau-street,* (11 *John.* 77,) several churches were included within a street assessment, and they claimed to be exempted from its operation by the 28th section of the act of 1813, for the assessment of taxes. (1 *R. S.* 519.) By this section it is enacted that "no real estate belonging to any church shall be taxed by any law of this state." The court held that all the provisions in the act, including the exemption, referred to general and public taxes to be assessed and collected for the benefit of the town, county or state at large. This was the whole point decided. The court proceeded, however, to observe, that to pay for the opening of a street in a ratio to the benefit or advantage derived from it, is no burden, and therefore no tax. "That there is no inconvenience or hardship in it, and the maxim of law that he who feels the benefit, ought to feel the burden also, is perfectly consistent with the interests and dictates of science and religion." Surely there are not *dicta* to be relied on to show that a street assessment is "*robbery.*" If they are to be regarded as authority, they prove that such an assessment when considered in reference to the benefit in connection with the money exacted, is no grievance; but they do not show that the act of exacting the money, considered by itself, is not an exercise of the taxing power. The point decided was, that a street assessment was not such a tax as the exemption contemplated:

The case of *Bleecker* v. *Ballou*, (3 *Wend.* 263,) contains a dictum of Chief Justice Savage founded on the case last cited, that a street assessment is not a tax. But the case called for [434] no such remark. The point decided was, that a covenant in a lease by which a tenant bound himself to pay " all such duties, taxes, *assessments*, impositions and payments as should, during the term, grow due and payable out of the demised premises," made him liable to pay a village street assessment. This was a plain case in which the lessee covenanted to pay all assessments, *eo nomine*, and whether they were taxes or not, was therefore not the question to be decided, nor material to the question. In *Sharp* v. *Spier*, (4 *Hill*, 76,) land had been sold under an assessment for constructing a well and pump, in the village of Brooklyn. The assessment was not charged on the lands sold, but upon the " owners and occupants" of the lands intended to be benefited. By a section in the village charter, it was enacted, that " whenever any tax of any description *on lands or tenements* in said village shall remain unpaid," &c. such lands might be sold. The point decided was that the sale was void. The assessment was upon the owners personally, and of course if the assessment was admitted to be a tax, there was no power to collect it by the sale, because the assessment was not on the land.

It is true that Bronson, J. who delivered the opinion repeated the dicta found in the *Matter of the Mayor of New-York*, (11 *John.* 77,) that an assessment is not regarded as a burthen, but as an equivalent for benefit, and therefore, can not be regarded as a tax; but the decision rested clearly and safely on other grounds; although if it had stood on this alone it would have established nothing except that an assessment was not a tax within the meaning of the 7th section of the act incorporating the village. The question whether street assessments are not made in virtue of the power of taxation, was not in that case decided. On the contrary, a question involving that point was expressly reserved as undecided, by Mr. Justice Bronson, who said, " I have not overlooked the fact that street assessments are, by the third section of this act, made a lien or charge on the

land. Whether that fact, taken in connection with the power conferred by the 7th section, will authorize a sale of land for street assessment, we are not now called upon to determine."

But the question now in controversy was involved and [435] decided in the court for the correction of errors in the case of *The Mayor, &c. of New-York* v. *Livingston*, (8 *Wend.* 85, 101.) In that case, a street was opened in the city of New-York, upon lands which had been previously dedicated by John R. Livingston to the public use for that purpose, but Mr. Livingston had never in any other way conveyed his title to the land within the limits of the street. He was the owner of the lands subject to the easement. He owned also lots of land adjoining the street, which together with lots owned by other proprietors, were assessed for the opening and improving the street under a provision similar to that by which the assessment now in controversy was made in the city of Brooklyn.

The amount of the assessment against him upon the adjoining lots was set off against the value of his interest in the lands within the street, and overbalanced it. He was charged in the assessment with the balance only. It did not appear that he was allowed in adjusting the balance, less than the full value of his lands within the street subject to the easement. He complained of the whole proceeding. First, because he was not allowed the full value of the land taken for the street, without reference to the easement; and, secondly, he complained of the assessment, by which his lots adjoining the street were charged with his proportion of the expense of the improvement in the same manner as other adjoining lots were charged. The objection to the proceedings was, that they were unconstitutional.

The late chancellor, in his opinion, said, " It was not denied that the legislature have the power to authorize the taking of private property for the purpose of public streets, upon making just compensation to the owners ; but it is insisted by the plaintiff's counsel, that the increased value *of the adjacent property,* can not be set off against the loss or damage sustained by him in taking his property for a street, and be considered as a just compensation for the property so taken." The chancellor pro-

nounced this objection untenable and proceeded—"The owner of property taken is entitled to a full compensation for the [436] damage he sustains thereby; but if the taking of his property for the public improvement is a benefit rather. than an injury to him, he certainly has no equitable claim to damages. Besides, it is a well settled principle, that where any particular county, district, or neighborhood is exclusively benefited by a public improvement, the inhabitants of that district may be taxed for the whole expense of the improvement, in proportion to the supposed benefits received by each. In this case, if the whole value of the property taken for a street in the city of New-York is allowed to the individual owner, the proprietors of the adjacent lots must be assessed for the purpose of paying that amount; and if the individual whose property is taken, is the owner of a lot adjacent, that lot must be assessed ratably with the others. It therefore makes no difference, whether he is allowed the whole value of the property taken in the first instance, and is assessed for his portion of the damage, or whether the one sum is offset against the other in the first place and the balance is only allowed."

Senator Sherman delivered an opinion concurring with the chancellor in the result, and these opinions were sustained by the unanimous vote of the court for the correction of errors.

This case affords an example of the exercise of the two powers before mentioned, that is, the power of eminent domain and the power of taxation; the first in taking the land for the use of the street, and the second in requiring contribution to defray the expenses of improving it, from that class of persons on whom the burthen ought to fall. The case affirms the validity of street assessments, in virtue of the latter power. In 15 *Wend.* 376, *Owners of Ground assessed* v. *Mayor, &c. of Albany,* the land of Mr. Betts, adjoining a square laid out in Albany, was assessed to pay the expenses, and Chief Justice Savage said, " It can not be conceded that any constitutional question properly arises in relation to Mr. Betts. *His property has not been taken for public use.*" And although he did not affirm or deny that the assessment was a tax, he affirmed the validity of the assessment

against the objection of unconstitutionality expressly raised; [437] and this could have been done on no other principle than that it was an exercise of the power of taxation.

In 1835 an act was passed (ch. 309) appointing commissioners, and authorizing them to " assess the sum of $41,000 upon the owners of all the real estate situated in the city of Utica, in proportion to the benefits which each shall be deemed to have acquired by the location of the northern termination of the Chenango Canal in the city of Utica, as nearly as the same can be estimated." The statute authorized the assessments to be collected in the same manner as taxes in Oneida county were collected. The commissioners and collector were sued for attempting to collect the assessment. But the statute was held to be constitutional, and the assessment was adjudged to be within the lawful exercise of the power of taxation. (*Thomas* v. *Leland*, 24 *Wend.* 65.) In *Stryker* v. *Kelly*, (7 *Hill*, 9, 23,) there had been a street assessment in the city of New York, and its validity was strenuously contested. Mr. Justice Beardsley says, " This was local taxation for a local purpose, and falls within the legitimate exercise of the taxing power." In this opinion Chief Justice Nelson concurred; and Bronson, J. agreed that the New-York street law was free from constitutional objection, except on the ground of a provision therein which is not contained in the street laws of Brooklyn, under which the assessment now in question was made. We have therefore in that case the unanimous opinion of the justices of the supreme court in favor of the validity of street assessments, so far as respects their constitutionality.

The judgment in *Stryker* v. *Kelly* was afterwards reversed, (2 *Denio*, 323,) but upon a point not affecting the question now under consideration. The examination of the cases decided in this state terminates in the conclusion, (although several of the cases contain dicta to the contrary,) that street assessments like that in controversy in this suit, have been adjudged, both in the supreme court and in the court for the correction of errors, to be lawful and constitutional taxation.

One of the objections to the validity of the assessment and

of the statute under which it was made, was that the assessment [438] was not made by a jury or by commissioners, as required by section 7 of article 1 of the constitution.

It is only necessary to say in reference to this objection, that the constitutional provision referred to applies only to private property taken for public use by right of eminent domain, and not to cases of taxation.

Taxation similar to that now in controversy has been sanctioned by long usage in this state and elsewhere.

In England, the commissioners of sewers assess the lands affected by their operations, without reference to other locality. (23 *H.* 8, *ch.* 5, § 3 ; 4 *Evans' Stat.* 26.)

In Massachusetts, meadows, swamps and low lands may be assessed among the proprietors for the expense of draining the same, without reference to any political district, and in proportion to the benefit each proprietor derives from the work. (*R. S. of Mass.* 673.) In Connecticut, the same power is given by statute to commissioners for draining marshy lands. (*Stat. of Conn. ed. of* 1839, *p.* 544.)

In Pennsylvania, South Carolina and Louisiana, taxation upon this principle has been practised and sanctioned as constitutional ; (9 *Dana*, 524 ;) and in New Jersey, Maryland, Virginia, Ohio and Indiana, it is understood that local taxation upon similar principles is authorized by law.

In the colony and state of New-York, the system of taxation for local purposes by assessing the burthen according to the benefit, has been in force for more than one hundred and fifty years. It was applied to highways in the county of Ulster in 1691. (*Bradf. Laws*, 45.) The power was given to the corporation of New-York in the same year. (*Id.* 9.) This statute remained in force in 1773, when Van Schaack's edition of the statutes was published, and no evidence of its repeal is found until 1787, when it seems to have been revised and its provisions re-enacted under the state constitution. (*Van Schaack's L.* 8, 9 ; 2 *Jones & Var.* 152 ; 1 *Greenl.* 443.) The colonial statute was doubtless in force when the state constitution was adopted. It is not unworthy of remark, that in April, 1691, a bill of rights

was passed for the security and protection of the people [439] of the province. The statute authorizing the assessments first mentioned was passed afterwards during the same year. In January, 1787, an act was passed declaring the rights of the citizens of this state, and prohibiting among other things that any person should be deprived of his property except by due course of law. The statute of 1787, authorizing street assessments in the city of New-York, was passed by the same legislature, and sanctioned by the same council of revision, which had assented to the bill of rights. Street assessments upon the same principle were authorized in the city of New-York in 1793, (3 *Greenl.* 58,) and in 1795, (*id.* 244, 245,) and in 1796, (*id.* 333, 334,) and in 1801, (2 *K. & R.* 130,) and in 1813, (2 *R. L.* 407.) The corporation of New-York have had and exercised authority to make street assessments from the infancy of that city. Similar powers have been conferred on nearly every city, and on many of the villages in this state. It has also been applied to highways, to turnpike roads, and to the draining of marshes.

This system of taxation was in force at the time of the making and adoption of our first, second and third constitutions, and has stood in our statute books along with the constitutions from 1777 until now, without prohibition or restraint. Sales of real estate to large amounts have been made, and the lands so sold are now held on the faith of the validity of these assessment laws. Proceedings under them have been brought before the supreme court for review, continually during the last thirty years. They have been litigated often on the ground of irregularity, and sometimes upon constitutional objections. They have been confirmed in cases almost without number. If the uniform practice of the government, from its origin, can settle any question of this nature, the power of the legislature to exercise this kind of taxation would seem to be established by it. Constitutional objections never prevailed against it until 1846, when the case of *The People* v. *The Mayor, &c. of Brooklyn,* was decided.

It is true, however, that they were complained of as operating harshly and unjustly in many instances. The subject was fre-

quently brought before the legislature, and was debated in the public press.

[440] The attempt was made in the convention of 1846, to abolish this mode of taxation. A standing committee was appointed to consider and report on the organization and power of cities and incorporated villages, and especially on their power of taxation, *assessment,* borrowing money, contracting debts, and loaning their credit. (*Convention Documents, No. 10 & 15.*) For the purpose of ascertaining what was meant by the word *assessment* as used in the resolution appointing the committee, we look most naturally to the action of the committee itself. We find that a majority of that committee reported a section prohibiting *local assessment for any improvement in a city, or village, unless upon application of a majority of the owners of the lands to be assessed,* and unless upon a vote of two-thirds of the common council, or board of trustees.

The minority reported the following section. "*No assessment for any improvement in any city, or village, shall be laid otherwise than by a general tax* upon the taxable property of such city or vilage, levied, and collected with an annual tax for other expenses." (*Debates in Conv. Argus ed.* 357.) Unless, therefore, we are at liberty to suppose that this committe reported by mistake upon a subject not referred to them, we are unavoidably led to the conclusion that they were required to consider and report upon assessments like that in question in this suit. Both the propositions reported by the committee failed; and after an unsuccessful effort by the chairman for their adoption, (*Debates, Argus ed.* 806, 980,) he submitted the following substitute, which was adopted and incorporated into the present constitution as the 9th section of the 8th article thereof, to wit : "It shall be the duty of the legislature to provide for the organization of cities and incorporated villages, *and to restrict their powers of* taxation, *assessment,* borrowing money, contracting debts, and loaning their credit, *so as to prevent abuses in assessments,* and in contracting debt by such municipal corporations."

Instead of abolishing the system of assessments, this section of the constitution refers it to the legislature for the correction

of its abuses. The direction given to restrict the power of cities and villages to make assessments pre-supposes and admits the existence of a power to be restricted. The constitution, [441] therefore, in this section, recognizes and affirms the validity of the legislation by which city and village assessments for local purposes like that now in controversy are authorized; and seems to remove all doubt in relation to the legislative power in question.

Several objections are made to the regularity of the assessment.

It is well settled, that upon a common law certiorari, the court will not examine the proceedings returned, further than to ascertain whether the inferior tribunal has kept within its jurisdictional limits.

It is objected that the resolution to do the work, if any was passed, was not approved by the mayor. This objection is not well founded in fact. The ordinance under which the work was actually done, was passed on the 28th of February, 1848, and was signed and approved by the mayor. The work was not done under the resolution of the 10th June, 1847.

Another objection is, that no notice was given to the owners of the land assessed. In the case of *The Owners of ground, &c.,* v. *The Mayor, &c. of Albany,* (15 *Wend.* 374,) it was adjudged that the legislature had authority to prescribe what notice should be given in the case of an assessment like the present, and if notice be given as thus required, it is sufficient. The only notice required by the statute under which the present assessment was made, is a notice to be published in the corporation newspapers for ten days before the day fixed for the alteration or confirmation of the assessment by the common council. This gives to any person assessed an opportunity to be heard, and is all the notice necessary. Such notice was given.

There is nothing in the statutes of 1834, under which the assessment in this case was made, requiring the assessors to ascertain, or certify the entire amount of benefit derived from the grading and paving the avenue. It was a work which the corporation directed to be done for the benefit of that part of the city, and the presumption is, in the absence of evidence

[442] to the contrary, that the benefits exceeded the expense. Had it been otherwise, the fact might have been shown before the common council, against the confirmation of the report.

The burthen of showing that the taxation was excessive and exorbitant, lay upon the relators, and this should have been done at the proper time and place. The common council would, undoubtedly, have set aside, or reduced the assessment, if it had been shown to be excessive or unjust. The case is not open to inquiry on that point here.

The case of *The Flatbush Avenue,* (1 *Barb. S. C. Rep.* 286,) has no application to the present case. The statutes of 1833 and 1838 there referred to, relate entirely to cases of opening and widening streets where land is taken for that purpose.

The judgment of the supreme court should be reversed, and the assessment affirmed.

Ordered accordingly.